Good morning, Your Honors, and may it please the Court, John Hacker for the appellant, Ford Motor Company. When Gene Edwards, I'd like to reserve three minutes for rebuttal if I could. Sorry? I'd like to reserve three minutes for rebuttal if I could. That's fine. Go ahead. When Gene Edwards' counsel filed the lawsuit in April of 2011, NHTSA was already investigating idle surging or flaring in certain Ford vehicles. Indeed, Edwards' suit was filed specifically because of the ongoing NHTSA inquiry. And while her suit proceeded in parallel, actually focused on a different mechanical problem, NHTSA and Ford separately addressed and resolved the actual problem through a customer service program that Ford implemented in November of 2012, unsurprisingly. I mean, as I understand it, NHTSA, there was not exactly a settlement. Is that right? That's correct. Not exactly a settlement is the way to put it. Because NHTSA just didn't seem to think a whole lot of the claim to begin with and just backed off at that point. Well, I think that's a slight overstatement. I think NHTSA took it quite seriously and was investigating and looking at it. There was an ongoing back and forth over how to resolve it. I think NHTSA, over time, as the direct evidence tells us, became — started to become convinced that there wasn't a — it was not going to be a safety problem, but NHTSA was still trying to figure out how to deal with it. Ford's initial measures, NHTSA later determined, were insufficient. And so Ford determined in mid-2012 that there needed to be a customer service program to further resolve the issues. There was correspondence between Ford and NHTSA in May and June of 2012. But to get to the nub of the problem here, is the catalyst determination insofar as it turns on whether what were — was the cause or what were the reasons for coming to this — creating this customer service plan a fact determination? It's ultimately a fact determination. All right. I think that's right. And so therefore reviewable for clear error? Sort of, if I may. It's ultimately reviewable for clear error unless the trial court applies an inappropriate legal framework. Right. So therefore — and if it were reviewed for clear error, you'd have a hard road to home. Well, I don't think so. I mean, I think there are plenty of cases that get reversed for clear error. And the problem here ultimately will be, when we talk about the facts, there's essentially no facts on the side of the plaintiff to show — Wait a minute. That's not right. That's not right. Isn't the toughest fact you've got — I think the chronology, which is where you But isn't the real nub of your problem that the CSP that was ultimately put in place was more robust than otherwise would have been the case? And my reading of your brief is that you're saying our client often does that. Well, yes, but it's not disputed that our client always does that. Yes, but it wasn't persuasive to the judge either. It wasn't persuasive to the fact finder. Well, but I think, first of all, the judge was asking the wrong question. This goes to the point about applying the correct legal standard. I think the judge was saying you haven't proven that the lawsuit wasn't a cause, and there are other explanations. Go ahead. But your analysis seems to be that the minute you came forward with anything, any presumption went poof. Well, not quite. I mean, the presumption does go poof. That's the law. What doesn't go poof, what doesn't go poof is the fact, the underlying fact that created the presumption. I mean, TRICA says the presumption itself drops out, and you then have to compare the evidence. But the key is the presumption is what puts a burden of production on the defendant. The presumption goes away. The burden goes back, and it always was with, to prove the causal effect. That stays with the plaintiff. And if I understand what the district court said, it's that because you just put, from somebody who knew about the new NHTA meetings, but didn't know, wasn't at the decision-making stage of why the program was put into effect, he didn't he wasn't responsive to the relevant question, which was not whether the NHSTA concerns  were part of the plan, but whether the lawsuit didn't. Right. So he basically said you didn't meet your burden of production because this affidavit didn't go to the right question. That's what I understood the district court to say. Right. And that's — I don't think the Court quite said that, but it's clearly wrong. I mean, both Mr. Ott and Mr. Baum said explicitly that they were not just around at Ford. They were both at the meetings, and Mr. Baum — actually, well, Mr. Ott — And Mr. Baum was only submitted on a motion to reconsider, right? Right. But the Court didn't say that it was belated. But focusing only on Mr. Ott, Mr. Ott supervised the inquiry with NHTSA. He was in charge of the whole — the implementation, the recommendation for the CSB. He made the decision to recommend it. He was the one at the meeting. Where does he say he made the — who's the decision-maker? The decision-maker is one of the three high-level — the ultimate decision, the person who says approve. It's literally just a checkbox. It just says approve. So where is that in the record? Did the district — was the district court wrong in thinking the district court didn't have that? The district court had it. There's one sheet that just says one of three options for signing approved. So whose name is on that line? On that one, I don't remember the name, but the title. It's not Ott, right? It's not Ott. That's correct, but it's made at a meeting where both Ott and Baum set forth. I mean, the evidence is not contradicted here. There's a fact sheet that explains the reasons for the program. None of that. Ott and Baum are there when they're discussing at the meeting to the person who's going to make the decision why you should adopt this. We read the briefs. And I agree. Kennedy, even if your narrative is correct, the district judge, as the fact finder in this proceeding, is not required to give 100 percent credence to the Ott affidavit, right, or declaration? Is that right? That's correct. But it goes back to a question Judge Kristin asked, which is the judge here never said that he found Mr. Ott not credible. He thought he was a liar. He had all he said was he didn't think Ott ultimately was a decision-maker. But he also said he wasn't addressing the right question. That's what I understood him to be saying. Well, on that point, all the judge says is, with respect, this goes back to the question about the broader remedies. All the judge says there, and I just, frankly, just don't understand this, the judge says that's irrelevant. The fact, not disputed, the judge doesn't disagree with this. The undisputed fact that Ford always provides those broader remedies when it adopts a CSP, that is a fact all of us have to take as true. The judge didn't say that was wrong. He just said I don't understand why it's relevant. But of course it's relevant. The other thing he said about the Ott declaration is that the summary sentence that said something like the lawsuit was not a reason, that he did discredit on the ground that it just wasn't – it was a legal conclusion or it was not something that Ott was – was a precipient witness about. Well – So that he washed out. And he didn't discredit the rest of what Ott was saying, but he said that he wasn't in the right place at the right time to answer the right question. Well, that part's wrong. He was at the meetings where it was discussed. There's one person who has a checkbox. There were two meetings, is that right? Yeah, there were two meetings, the TRG meeting and the FRC meeting. And what was discussed, as I understand it, was the details of this plan. And the reasons for adopting it. That's the only thing that was discussed, was whether or not to adopt it. And the only things that were – Whether or not to adopt it is not the same as the reason to adopt it. Well, I think they are. And certainly, there's no evidence – the other side deduced no evidence that there was some other mysterious reason in the mind of the person who checked I approve. These are the people – go ahead. It strikes me that you've done a really fine job with this briefing and that this was a really close question. And what I'm trying to get at is, can you – can you tell me succinctly why you think we are in a position to reverse this ruling? Why was there really error as opposed to maybe somebody else would have come to a different result? I think there's – can I give two? I hope they're both succinct. You can give two, but I'm just trying to get you to – what is it? Two categorical problems. I think when you read the record and the decision the judge made, it's exactly like the TRICA case, where the California Court of Appeals said, as we're looking at this, there's so much evidence on the side of the party rebutting the presumption. The court must have been holding that party to a burden of proof, not production. And that would be legal error, if that's how you read it. Is that – So that's point one. Yeah. Okay. General problem one. Got that. General problem two is, if you think the court did it right and was asking the question, did the plaintiff prove her case and show that there was a causal connection here, then it's clearly erroneous because there's essentially no evidence on their side. The uncontradicted, direct evidence, this is unlike Chinn. It's – go ahead. So for this one, for number two, you've got to get to clearly erroneous, right? What I'm saying – yes. What I'm saying is, if the court thinks the court – So why are they clearly erroneous? And why it's clearly erroneous is the only evidence on their side is the chronology, which I think is meaningless here. Well, it's only a chronology. Surely you don't think it's meaningless. It's – I mean, meaningless may be an overstatement, but it's not a strong chronology like you had in Chinn, for example. It's a minimum chronology, and what you have is direct evidence that's not contradicted. And the dog that didn't bark is the absence of their direct evidence. What you had in Chinn, what you had in McDonald, was actual evidence from the manufacturer saying, here's why we did this program. And in both cases, that actual direct evidence included documents saying the lawsuit is among the reasons. There's no evidence on their side. Do you want to talk about the Lodestar argument? The answer is no, I don't want to talk about it, but I – I only mean in the – I don't mean to be glib. And I – we certainly urge the Court not to reach that because we think that there's a different problem here. But we don't think there's any error. On this, the Court clearly got right. The other side's position, as I understand it, becomes clear in their reply brief, is that there's a requirement as a matter of law that the Lodestar not account for any contingency risk, that you just can't do it that way, and the Court erred in doing it that way. And I don't see any case that supports that. Ketchum is to the contrary. Ketchum actually says explicitly when the Court goes through the Lodestar, the next thing the Court does is, and I quote, "...should consider the degree to which the relevant market compensates for contingency risk." So what Ketchum is saying is when you look back at the Lodestar in deciding whether or not to add a contingency multiplier, one of the things you do is go back and figure out whether or not the Lodestar you've used already accounts for contingency risk. So Ketchum is explicitly saying that you're allowed to do the thing – they're explicitly rejecting the only argument I understand them to be making, that it was an error and an abuse of discretion in making this determination. I'll reserve the balance of my time. Thank you. Thank you very much. Good morning, Your Honors. May it please the Court. David Stein on behalf of Plaintiff Gene Edwards. I think it's pretty clear that Ford is trying to evade clear error review here by suggesting an error of law that's not present. The district court identified a legal framework that has been used repeatedly by the California appellate court. Well, what evidence is there on your side to support a finding that Ford had some other reason? So I'm happy to summarize that. I'll preface it with a concession that I'm happy to make. We didn't come forward with direct evidence in the form of some smoking gun email. And that's not unusual in these cases. The California appellate court's ready. But it is concerning. This is catalyst theory, the theory that we're talking about, and it's also uncontested that this fix, if I can use that shorthand, this was underway, right? It was the National Highway – that was already happening. That's his strongest argument. So I repeat, what evidence is there? Okay. Let me take you through the chronology. But I think I do need to – Well, he admits the chronology is the only thing that's there on your side from which you can – That's not the district court's finding. Okay. What is there besides the chronology? What evidence is there? The district court pointed to several items outside the chronology. For example, that immediately after implementing this fix – or, I'm sorry, not the fix. The fix happened, just to be clear, in October of 2011. Isn't your strongest point that the CSP is more robust than it otherwise would have been? I think that's part of this. But we have to keep in mind what the California Supreme Court guidance is here. The district court is going to be close to and familiar with this litigation. And I think it's a mistake to try and isolate on any particular aspect of this. The district court was with this case from the beginning. It's had it since 2011. Well, that's not very helpful. I mean, the question remains, what is the evidence? The district court did point to other – it pointed to the chronology in some very specific ways, i.e., that you made the specific demands at various points which were not responded to and which were after the lawsuit was underway. What else? So if I may, I think it's very important to clarify that chronology when it comes to this repair. So by late 2010, early 2011, Ford knows two things. It knows that it has a burgeoning customer satisfaction problem. It's getting a bunch of complaints about this problem. And it knows that the federal regulators at NHTSA are looking into it. At that point, Ford does not issue a warning to drivers saying, hey, this is a progressive problem. People are complaining about it. Watch out for it. It doesn't contact dealers and say, you need to provide repairs for free because this is important to our customers. And it certainly doesn't offer any sort of reimbursements for repairs that already exist. Now, we file our lawsuit after serving a demand letter that went ignored. Several months into the lawsuit... It went ignored for how long? Five weeks? Seven weeks. Several months into the lawsuit, fairly early in the lawsuit, Ford issues the repair. The repair is issued in October of 2011. That's a full year before the customer satisfaction program. At that point, there's no warning to drivers. There's no free repairs. There's no repair reimbursements. In 2012, we start making headway in the litigation. We win a discovery motion in... You'll make great headway, though, because you lose the class action motion. The class. That's true. And what's the bullet point in the timeline? When did you lose the class? So we win that discovery motion in, I believe it's February. Ford has to produce those documents by March, April. At that point, we're already on file with class certification. The denial, I think, is April, May. At that point, we come in on reconsideration, and we marshal that evidence that we've uncovered through that discovery motion. And it's at that point that we have, all of a sudden, this customer satisfaction program. And to be clear, on this denial of class certification, Ford's asking this court to treat that as kind of the end of the litigation. We were on life support. We weren't achieving anything. The district court is the one that issued this order, and it has a different understanding of its order. It says, no, I said you could narrow your class definition and come back. I didn't view that as this is a dead lawsuit with no future. Right. But as I said, or at least I've tipped my hand, I think this is a really close issue. So can you tell me, what are your strongest points? I think the points... Other than telling us that we need to defer to the district court because it babysat the litigation. I don't mean to use that term derisively, but I understand that. So I think that starting at the beginning of the chronology is important. The fact that Ford had the impetus that its claiming was decisive way back in late 2010, early 2011, that didn't drive it to do anything at that point. It already knew the Federal regulators were looking into it, already had customer satisfaction. But also, which is of some consequence to the district court, that the Ott Declaration at least said one thing that supported you, which was that the NHTSA didn't think there was a problem. That was under its movement. That's exactly right. And that's a major concession by Ford in this case. I'm just waiting for you to tick them off. What are your strongest points? Well, let's go with that. I mean, that's a very strong point. I mean, the NHTSA, to spell it out, is the Highway Traffic Safety Administration. We know that, counsel. Okay. But it's not a consumer, it's not the CFPB or the FTC. And when it finds that there's no safety issue, it has no prerogative to continue putting pressure for a customer satisfaction program. You don't have to take my word for that. Per the district court, Ford told the district court that when it was defending class certification. It said if NHTSA doesn't find there to be a safety issue, it's not going to pressure us to provide any relief. I've said a couple of times it seems to me very significant that the CSP was more robust than it otherwise would have been. The district court thought that, I think. But opposing counsel says that it's undisputed that his client is, I think he said, entirely consistent. He said always does that. Is that disputed? It is. I mean, the... Where in the record do I find that? So the evidence that Ford came forward with in opposition to our attorney fee motion was a document that said when there is a federally supervised safety recall, which we didn't have in this case, it's our practice as a company to provide repair reimbursements. So did you have any contrary evidence to his assertion or are you just telling me it's not... His assertion is not supported? His assertion, first of all, didn't come at that stage. It came later. And, yes, there was no documentation in support of it. And no contrary documentation either? There's no contrary documentation either. All right. Do you want to talk about the Lodestar issue? I'm happy to. In our view, it's a fairly simple... You're sort of in the same position on the Lodestar question as your opponent is on the Catalyst question, i.e., you're unless you argue and you do argue that there was legal error made, you're in no place, right? I think that's fair. I mean... Where's the legal error? So our read of Ketchum, and it's, I mean, Ketchum's the California Supreme Court case that uses italics to make this point, is that when a California court calculates a Lodestar, it uses non-contingent rates to do that. Well, except that in the first order, the district court did quote the general sentence about non-contingent rates, but when it went in great detail in the reconsideration order, it said that it was very specific about the fact that the rates that were being used were from plaintiff's law firms in contingent cases, no? That's absolutely right. And I think there's a really intuitive grasp there that's just actually a mistake, which is a plaintiff contingency firm's rates are not actually contingent rates. That's the way the Lodestar works in California. When a plaintiff's firm, even if it's a pure contingency law firm, asks to be compensated in a Lodestar case, the rates that are used to compensate the law firm are non-contingent rates. They are the rates that are supported in fee-paying cases of equal complexity. What's the appropriate standard of review for this question? I think it's abusive discretion. Right. And so why was this an abusive discretion, given that your argument is that the district court was the one who really had its finger on the pulse of this litigation and may have been influenced by the fact that the National Highway Safety Administration was already on this problem? And just to be clear, are we still focusing on the multiplier question at this point? Yes. Okay. Because you have to tell me that it was an abusive discretion. Right. And to be frank, if the district court had said, I'm looking at the facts here. I don't think there is a real contingency risk, or I don't think this market that I'm familiar with really compensates for contingency risk, so I'm denying it. If it had made factual findings along those lines, we wouldn't be here. But contingency risk is not the only factor for a multiplier, right? That's true, Your Honor. Or for denying a multiplier. Well, our basis for requesting the multiplier was the contingency risk, which is — But isn't it a — why shouldn't I think that the district court appropriately thought it was a reduced risk, given that this — your team didn't uncover this problem, the Federal government was already on it, as I said, already pursuing the problem? That wasn't — I mean, that's just not the district court's findings. The district court — But it just seems to me to really cut two ways, that you want us to say that the district court, on the one hand, really had its finger on the pulse of this litigation when we're talking about the other argument, but when we're talking about the Lodestar, that you think the district court truly — truly abused its discretion. No. And I want to be crystal clear. On the multiplier issue, I think it's a — it's just a mistake of understanding the law. I don't think — The error of law is that in California, the contingency — just the method that we've just been talking about with the Ketam K? The error of law is that when it calculated the Lodestar, it used non-contingent rates. And then to turn around and say there may be contingency rates being used here is just a — it's just a simple mistake of law. If the court made findings saying, look, in San Diego, in the Southern District of California, there's no difference between non-contingent and contingent rates, that would be fine. Well, so the district court said that the courts in Chambas and Gallucci made specific findings that the rates sort were reasonable for plaintiff class action attorneys. Right? Right. So why — I mean, you're saying, sort of as a deus ex machina, that those were not contingency rates, but why — what's all the stress about the fact that these were plaintiff class actions attorneys? I think that's where the district court just kind of — it made a very intuitive leap there, but it's just wrong. You contest that? My — no. I don't contest that plaintiff contingency firms were charging those rates. What I contest — Just that it doesn't — it doesn't bake in the litigation risk. That doesn't bake in contingent rates, because under California law, if you're going to compensate contingency risk, you do that through the multiplier and not through the rate. It may not be necessary. Why? Where are you getting that from? That's Ketchum. That's our read of Ketchum. I think the courts — Well, you can — you can compensate it through a multiplier. But do you have to compensate it? Absolutely not. And that's why we're not asking for a reversal of direction here. We just think the district court needs to actually consider these facts. What was the extent of the risk, and does it need to be compensated? If there are no other questions, Your Honors, thank you. Thank you. So I'd like to start with Judge Berzon's — what I perceive to be her concern and then go through the evidence that Judge Christian was asking about. Judge Berzon, you focused on the determination, the finding, that the district court made with respect to Ott not addressing the right question. Look at exactly what the Court says about that. I looked really exactly. All right. Well, I'll read it out. Mr. Ott does not appear to be in a position to speak to whether plaintiff's lawsuit — What page are you on? Yes. ER11, page 10 of the amendment. ER11. Thank you. Mr. Ott does not appear to be in a position to speak to whether plaintiff's lawsuit was also a factor or to know of any other factors that initiated the process that lead — led to the CSB. And he says he merely stated his job responsibilities. That is not reconcilable with any coherent reading of what Mr. Ott said. It's just wrong. What Mr. Ott said is, I was present at the TRG and FRC meetings at which CSP-12903 was approved. I do not recall any discussion of this class-action lawsuit in any meeting that I attended that related to the CSP. Earlier in his declaration, he explains that he wasn't just somebody who regularly coordinated with NHTSA. His function here was to work out the CSP in connection with NHTSA. That's what he did. And then he goes to the meetings and says, this is why we need to do the CSP. The Court is just completely off-base in saying that Mr. Ott was not in a position to know why it was adopted. Well, I think he was — I mean, I know what you're going to say about this. But the Court was quite disturbed about the fact that none of the actual decision-makers provided any affidavit, that the person — for some reason, the person who was chosen to provide an affidavit was not an actual decision-maker. He was an observer of decision-makers and — and was at the meetings. Not — not quite, Your Honor, because both Ott and Baum are the people who explained to the person who checks off why they should do it. They know better than the decision-makers, by the way. He comes back to where we were a half an hour ago, and I said, whose name was on that line, right? It's not Ott. And — and I — again, I think you've done a great job here. I'm just — it just seems to be a very close call, and I'm trying to figure out why the judge is wrong in doing what he did here. So let me turn to — He wasn't persuaded. He didn't think that was enough. Well, I — what the judge said, I think, just speaks for itself. He said Ott wasn't in a position to know, but he was there when the — when they said, here's why you decision-makers should adopt it. There's no evidence that it would — He was there. So Ott was there. I don't mean to interrupt you, but he's the guy who made the recommendation right? He's not the guy who checked the box and signed the law. What I'm saying is, there's no evidence, and there wasn't some separate secret caucus later where the decision-makers talked about the real reasons. But what you keep not doing is answering my question. I've — I've answered the question. Ott wasn't the one who checked the box. That's true. Right. And that was really significant to the district court, right? And why is he wrong? And it's wrong because the direct evidence tells us, at the meeting when the decision was made, the lawsuit wasn't discussed. There's no evidence that when the decision-maker sat at that meeting, he in his mind said, ah, but the lawsuit, that's the secret real reason I want to do that. That's the kind of evidence they would need to induce. When the decision-maker is told the reasons you ought to adopt this, Ott is the one telling him. Baum is the one telling him. And there's no evidence that the decision-maker, that person at that meeting, was ever told the lawsuit was a reason to adopt it. So we know what the decision-maker was looking at. Decision-maker was looking at the reasons that Ott and Baum were recommending it. Now, if I could just turn briefly to the robustness of the other, of the ultimate remedy. Ott explains this, too, at FER number 5, page 5. What he says at FER 5 is exactly what I represented. When Ford announces a voluntary safety program or a CSPB that includes an extended warranty, it is customary for Ford to include a reimbursement component under which But I think what was bothering the district court are two things. First, it could have been done months earlier, but wasn't. And, two, it doesn't look like the NHTSA was much of the reason, because there are, according to Ott, the NHTSA did not believe the subject vehicle's contained an unreasonable safety defect, and that was its only jurisdiction. So for those two reasons, he concluded that this couldn't have been the only reason, because it wasn't — it neither would lead to those remedies. There was no earlier remedy. It wouldn't have led to those remedies, and it might not have — it probably wouldn't lead to any remedy. So what's the problem? Why would you do this just for NHTSA when they didn't actually think there was a problem? So the first one, I literally don't even understand what the judge means by it could or should have been done earlier. What the evidence shows is we were working with NHTSA. There's a document to — there's a conference call in May, and then a letter sent in June of 2012 where we're talking about the next thing that we're going to do. NHTSA still wasn't satisfied. Remember, we adopted different programs in October and — September and October, I think it was, that weren't satisfactory. The NHTSA's closing document says those programs weren't efficacious enough. And what Ford ultimately did, that's what satisfied them, because the customers weren't told. Sotomayor, where is the NHTSA closing document in the record? Is it in the record? You'll see that at ER — ER 94. It's called a resume for reasons that are beyond me. But it — NHTSA goes through and explains what happened and says that Ford's interim remedies weren't enough because they didn't advise customers, and dealers were still confused about how to solve the problem. And when Ford adopted CSP-12-N03, that satisfied NHTSA, and so it — it closed the investigation. It's why you think the chronology cuts your way. It at least cuts our way. It doesn't — it doesn't establish their — their case. That's — that's for sure. And then the other point Your Honor raised was about whether NHTSA could ultimately do something. I think that closing document answers it. NHTSA was still looking at it. NHTSA wasn't satisfied that there was no safety problem yet. Ott anticipated that. The reason they adopted this program was that Ott thought it would be sufficient to satisfy NHTSA. That was his perception. He didn't believe that NHTSA was going to agree there wasn't a safety defect. He didn't know that. And ultimately, he was exactly right. No, I — it is a close case, which — anyway. Thank you. Thank you both. We are going to the case of Edwards v. Ford Motor Company. And thanks both of you for a helpful argument. Thank you very much. And we're going to take a short break. Thank you.
judges: Tashima, Berzon, Christen